Case number 19-7167, Military Order of the Purple Heart Service Foundation, Inc., a Florida Corporation, and MOPHSF Holdings, LLC, a Florida Limited Liability Company, v. Military Order of the Purple Heart of the United States of America, Inc., a District of Columbia Corporation Appellant. Mr. Herrick for the Appellant, Mr. Stern for the I hope so, Your Honor. Okay, before you start, can we just ask Mr. Sturm to turn his unmute, Mr. Sturm, and make sure we can hear him so we don't get caught midstream again. Your Honor, can you hear me? Hear you fine. Okay, very good. Mr. Herrick. Thank you, Your Honor, and good morning. My name is Stephen Herrick. I represent the Military Order of the Purple Heart of the United States of America in this appeal. I would like to start by addressing the case in which the order is the plaintiff. That's case number 996, which alleges the Foundation's brief, I'm sorry, breach of the 2016 agreement between the Order and the Foundation. Section 3.3 of that agreement required the Foundation to fund the reasonable budget submitted to it by the Order, and the Fund a $6.4 million budget submitted to it by the Order for fiscal year 2019. The Foundation has argued that it never entered into a binding commitment to fund the Order at that level, but it is our view that this argument should receive no consideration from this Court, as it is belied by the language of the approval letter by Foundation Chair Mr. Rooley, which stated, quote, the restricted grant for the next fiscal year is as follows, 2018-2019, $6,400,000. Now, the use of the term restricted in Mr. Rooley's email is not explained, but apparently it is a reference to grant documents issued by the Foundation in prior years, which stated that the Foundation had the right not to fund the grant in whole or in part based upon its financial condition during the term of the grant. However, unlike those prior years, the Foundation did not issue any grant for fiscal year 2019, let alone one conditioning its funding obligation on its ability to pay. And the Foundation's CEO, Mr. Ruckman, testified at trial that the Foundation sought no such condition to its approval of the Order's FY 2019 budget, because it believed that the Order would not agree to it. And in this regard, Mr. Ruckman's assessment is absolutely correct, given the Foundation's... Mr. Ruckman, you're deep in the weeds of extrinsic evidence, right? And the District Court considered extrinsic evidence and made findings of fact against you on this point. I understand, Your Honor. Okay, so moving on to the legal point here, okay? Section 5.2 of the 2016 agreement provides that in the event the Service Foundation does not found the Order, the assets or control of the new entity will be transferred to the Order. And that new entity is Holdings, the holder of the wordmark Purple Heart. The District Court refused to read the does not fund language of Section 5.2 of the 2016 agreement in the context of the will fund the reasonable budget language of Section 5.3, finding that the $2 million shortfall did not constitute a breach of the 2016 agreement. Doing so, the District Court manifestly disregarded primary rules of contract interpretation. A court must interpret the language of a contract as a whole, giving a reasonable, lawful and effective meaning to all terms, all its terms, and ascertain the meaning in light of all the circumstances surrounding the parties at the time the contract was made. As a corollary to this rule, contract language should not be interpreted to render a contract promise illusory or meaningless. In ruling that the Service Foundation's $2 million shortfall in funding the Order's 2019 fiscal year budget, that this did not violate the language of Section 5.2, the District Court essentially adopted the position of the Foundation that even if it gave the Order only $1 in fiscal year 2019, this would not have violated the does not fund language of Section 5.2. And it was respectfully submitted to the Court that such an interpretation manifestly renders the Foundation's unconditional promise in Section 3.3 to fund the reasonable budget submitted to it by the Order illusory and meaningless. Moreover, the Court's interpretation of the 2016 agreement fails to interpret that agreement in light of all the circumstances surrounding the parties at the time the contract was made. Specifically, the pattern and practice of the parties was that the Order would incur expenses, including payroll for its veteran services officers, which would then be covered by the Foundation's payment after the fact. By reducing those payments from an average of more than $500,000 for the first seven years of fiscal 2019 to $25,000 per month, the Foundation assured not only that the Order would be in immediate default of its obligations, a fact conceded by CEO Ruckman at the trial, but also that the Order would not in good faith be able to incur the future expenses necessary to its continued operation, thereby sabotaging the Order's longstanding mission of helping thousands of veterans with their claims to the VA and operating a suicide prevention hotline. The equities of the situation also bear consideration. The reason the Foundation could not fund the Order's budget that it had unconditionally approved is that it had been hemorrhaging money, millions of dollars over the course of more than a decade, due to its outmoded funding model and its payment of outrageous fees to professional fundraisers, earning it an F rating from one rating service. This Court should give no consideration to the agreement. No evidence whatsoever was presented by the Foundation at the trial to show that its failure to fully fund the Order's FY 2019 budget was due to the funding requirements of the Foundation's own reasonable and necessary operations. Is that your burden, or is that their burden? Well, I believe that it's their burden, Your Honor. Why is that? Because it's in the nature of an affirmative defense. They are relying on a provision that says, we don't have to fund you if we can't afford it, because you are the third order of prioritization. This is on your claim for breach, though. This is on our claim of their breach of the 2016 agreement. With respect to this claim, you are the plaintiff. We are the plaintiff. I am anticipating what I believe to be an affirmative defense on the part of the Foundation that the third order of priority with respect to funding, and therefore, did not have to be funded if, after funding the reasonable and necessary expenses of the Foundation and holdings, that there was not enough money to fund the approved budget of $6.4 million of the Order. That argument was raised at the trial, and I believe in anticipation that it might be again before this court. It is our position that there is no proof in the record and that, in fact, the Foundation and holdings did not even make the argument that the reason they did not fund the full budget of the Order for fiscal year 2019 is because of Foundation's and holdings' own expenses. Mr. Herrick, I know you don't agree with me on this point, but assume I think it was your burden. Can you still win? Our burden to show that the reason… On the question of whether or not there was breach when the Foundation did not pay the $6.5 million that the Order was expecting. I see. And what the Foundation says is, well, we went in the order of priority, we paid the Foundation expenses, then we paid the holding expenses, and then we paid what was left to the third order of priority, to the Order. And they say, therefore, it wasn't breach. We did what we were supposed to do. And you say, no, you did breach. If it was your burden to show that they didn't follow the order of priority or that they did follow the order of priority, but they somehow wasted money on priority one or priority two, if that was your burden to show, is there any way that you can still win on this one? Yes, Your Honor. The breach of that contract. Yes. Well, because there's no proof in the record, and I don't believe that the appellees even invoked that provision in saying that that's the reason why they didn't pay the full budget of the Order. There's no proof in the record as to how much money was spent on the Foundation's expenses for that fiscal year. But again, Mr. Herrick, you keep saying there's no proof in the record, and I'm saying assume I think it was your burden to put proof in the record. What do I do then? Well, I think, Your Honor, that the record has no evidence of expenses on behalf of the Foundation or the Order. And so that is not a reasonable explanation for why the Foundation did not fund the reasonable and fully fund the reasonable order, a budget of the Order that it had approved. And I think it is, you know, these are their own expenses. We don't have access to those expenses. And so I believe that it is fair to at least shift the burden once we show that there is no proof in the record to establish that the reason that the Order's budget wasn't fully funded was the expenses of the Foundation and the Order. I think it is reasonable to shift the burden to the appellees to explain why that was the case. And that has not happened here. And I think the fact of the matter is that the reason that this budget was not fully funded was because of the mismanagement of the Foundation with fundraising efforts. And at bottom, the legal issue here is that the fair and reasonable interpretation of the 2016 agreement must be that the does not fund language of Section 5.2 be read in harmony with the reasonable budget language of Section 3.3. And in doing so, it compels the conclusion that the Foundation's unilateral reduction of the payments of the Order constitutes a breach of the 2016 agreement, and the District Court's contrary conclusion to be reversed. That's certainly one plausible way to read the contract, which is that the word fund in 5.2 is a shorthand reference back to fund the reasonable budget in 3.3. But it's not necessarily the only possible reading. 5.2 just says fund. Maybe that means substantially fund. And on these facts, it wasn't a dollar. It was millions of dollars. So why isn't that enough at least to create enough ambiguity for the District Court to resolve that question against you on the facts? Well, I think the problem here is that under Section 3.3, does not fund is rendered meaningless. If you say that any time that the Foundation cannot come up with an excuse not to fully fund the Order in the context of the consequences of that decision, which were that the Order basically went out of the business of servicing veterans. Because it had acquired the expenses and then was not reimbursed for them as had been the case over the prior years by the Foundation. What is the point of Section 3.3 then? I mean, it's rendered meaningless. The agents of the Order has no remedy if the Foundation unilaterally cuts its budget by 95% a month after the expenses have already been incurred. Well, maybe you have whatever remedy flows from a breach of 3.3. If you think of 3.3 and 5.2 separately, maybe there's a breach of 3.3. But what you don't get is the kind of nuclear remedy of 5.2, which is that you get to take over holdings. Well, I think the problem respectfully, Judge Cassius, with that analysis is that the other remedy is monetary damages. And it's clear from the financial situation of the Foundation that they don't have the wherewithal to provide monetary damages. And that's why the Order did not agree to the restriction, was not even presented with a restriction. Which may not leave you with any meaningful remedy if it turns out that they have no money. But that's a little bit different from saying that just on the face of the contract, 3.3 is rendered into surplusage. Well, I think that you have to consider all of the facts that existed at the time that this promise was made. And that includes the Foundation's dire financial situation, which they themselves analyzed before agreeing to provide the Order with $6.4 million for fiscal year 2019. And the contract has to be interpreted as a whole, given reasonable, lawful, and effective meaning to all its terms and conditions in light of all the circumstances surrounding the parties at the time the contract was made. And those circumstances were that the Foundation was in financial difficulty. And that was one of the things that by the parties when the Foundation agreed to fund $6.4 million without restriction, didn't even offer a restriction to the Order because as Chairman Ruckman testified, or CEO Ruckman testified at the trial, they knew he wouldn't agree to it. And it would have been foolhardy for the Order to agree to that under the circumstances of the situation. And so giving consideration to all of the circumstances, which is what is required, okay, under these circumstances, Section 3.3 has basically been rendered nugatory. There's no remedy, okay? And the contract remedy was specifically to turn over, if they didn't comply with the funding requirement, the remedy was to turn over the assets of... Understood. You want to take a minute or two on the claims against you? Sure. The issue with respect to the claims by the Foundation holdings against the Order is that the Order violated Section 6.1 of the 2016 Agreement, which provided that in the event the Order seeks to disenfranchise or takes other adverse action against the Foundation, the 2016 Agreement would be considered null and void after notice secured by the Foundation. And the District Court found that the fundraising efforts by the Order undertaken in an effort to protect itself from the Foundation's freefall constituted an adverse action in violation of Section 6.1. And in this regard, the District Court relied on a dictionary definition of the word adverse. And in doing so, it not only ignored the complete verbiage of the relevant phrase of 6.1, which is, quote, other adverse action, unquote, but it also parsed that phrase from the specific adverse action identified earlier in the same sentence, which is, quote, seeks to disenfranchise, unquote. It is the Order's position that when properly relating takes other adverse action against the Service Foundation back to the phrase seeks to disenfranchise, it becomes obvious that Section 6.1 was intended to protect the Foundation from existential threats from the Order, such as disenfranchisement. In other words, a separation of the Order from the Foundation, such that the Foundation would no longer be the fundraising arm of the Order. And as noted, the District Court's ruling was based on the Order's fundraising efforts. But the illogic of this conclusion is highlighted by its own analysis earlier in its decision that press releases by the Order did not violate the 2009 Memorandum of Understanding between the parties because they were isolated statements expressed in the good faith belief that the Order faced a budget cut and would soon be enforced, soon be forced to close important programs, and that it did not appear that the Foundation suffered significant lasting harm. And the same has to be true, has to be said of the Order's fundraising efforts. They were motivated by the same fundraising funding concerns. And as for significant lasting harm, Foundation CEO Ruckman testified at the trial that the type of direct mail solicitation conducted by the Order constituted just one to two percent of the Foundation's fundraising. Only significant lasting harm suffered by the Foundation was that the Foundation had, or was that harm that the Foundation had already inflicted on itself for years before the Order's fundraising efforts became an issue. What about the $50,000 check, Mr. Herrick? I'm sorry? The $50,000 check, there's evidence that there was a donor who was going to the Foundation. The Order swooped in and said, no, don't make a $50,000 donation to the Foundation, make it to the Order instead. It seems like action that is adverse to the Foundation. They seem $50,000 poorer than they would have been. Well, I think again, Judge, you have to consider the words other adverse action in the context of the prior language of seeks to that the type of harm that we're talking here, the type of action that we're talking here, is action that is an existential threat to the existence of the Foundation, which clearly, I mean, when you're talking about a budget of $6.4 million, okay, a $50,000, an alleged $50,000 diversion of a contribution that was supposed to go to the Foundation, is not an adverse action in that context. It is not an existential threat to the existence of the Foundation, such as disenfranchising would be, okay? So again, whether you include the $50,000 or you exclude the $50,000, the fundraising efforts of the Order were de minimis in relation to the fundraising needs of the Foundation. And therefore, no legitimate adverse action such as would preclude or allow for the termination of the 2016 Settlement Agreement. Okay. Judge Walker, any other? No. No, no, no. Judge Rapp? No. Okay. Thank you, Mr. Herrick. Thank you, Your Honor. Mr. Sturm. Good morning, Your Honor. May it please the Court, Michael Sturm of Lathrop GPM on behalf of the appellees. Mr. Herrick spent some of his time during argument attacking the Foundation, and that's consistent with the leadership of the Order treating the Foundation as the quote-unquote enemy and planning to destroy the Foundation in court. That's at page 1094 of the Confidential Appendix. Let's just focus on the legal issues. So starting with the claim against you, boy, you look at this contract and 3.3 says the Foundation, subject to the priority rules, will fund a reasonable budget submitted by the Order. And 5.2 talks about the legal consequences if the Foundation does not fund the Order. Isn't the most natural reading of fund the Order in 5.2 to satisfy the funding obligation set out in 3.3? Well, no, because the plain language just says does not fund, and it notably uses different language than is used in 3.3. It uses language that seems like an obvious shorthand. Well, that's contrary to what— Fund the Order following up on fund the reasonable budget submitted by the Order. It's not that long an agreement, and they use different language. And if you look back at the negotiation history, 5.2 was a highly negotiated position and provision, and the Order tried to get in various language into 5.2 that might have helped its position, because originally it said stops properly funding. Later it said does not properly and timely fund. And if they had gotten that in there, those are at pages 266 and 285 of the Confidential Appendix. If they had gotten some of that language in there, they might have a better position. But the parties settled on does not fund and rejected the broader language, rejected material breach as a provision that would trigger transfer under 5.2. So in view of that negotiation history, I don't think you can reasonably view does not fund as a shorthand, and certainly the district court did not. And I understand the force of your argument about the extrinsic evidence in the district court's findings. I'm just wondering, that's only helpful to you if we find the contract ambiguous on this point. But on the plain language, it only says does not fund. It doesn't say does not fund reasonable budget. And that would be presumed, the difference would be presumed to be meaningful. Understood. But we find ambiguity only after applying canons of construction. And I don't know, it seems to me the more plausible reading of the contract is that does not fund in 5.2 as a shorthand. But I guess we've talked that out. So go ahead. Well, and the other thing I would point out, I mean, she read the language in context. The other provisions of 5.2 are dissolution or going out of business. In both of those situations, it would be a permanent and total cessation of funding to the order, not a temporary shortfall. There's the long course of dealings between the parties which said there was never a guarantee. Essentially what the order wants here is a guarantee of their practice after the agreement. It had never been the practice. And in fact, there's also testimony when we get to the extrinsic evidence that both Steve Ruckman, who was the foundation's witness, and Jason Johns, who negotiated from the order, said that during the negotiations, the order never asked for a guarantee and the foundation wouldn't have given one. So that said, Ruckman's testimony is at 390 to 91 of the joint appendix, and Johns is at 712 of the joint appendix. So the extrinsic evidence is all of it points in the same direction with respect to 5.2. And Judge Friedrich made all those findings, and the order hasn't shown that any of them is clearly erroneous, let alone all of them. Okay. 3.3, I think, is clearly a, it's a prioritization. It's not a mandate. Essentially, what Mr. Herod's argument is that 3.3 should create a remedy for any shortfall, but that's not the way it reads. It's just, this is the waterfall of how the raised money is devoted. There's no evidence, going back to the burden argument, there is no evidence that the foundation violated that prioritization. And in fact, there's expressed testimony from Mr. Ruckman that they complied with the prioritization, they didn't fund the lower priorities, and that's at pages 437 to 338 of the joint appendix. Mr. Ruckman also testified that the expenses incurred were reasonable and necessary. That's at 492 of the joint appendix. And the order also says, or Mr. Herod said during his argument, that the burden shifting was necessary because the foundation was in sole possession of financial records. Section 2 of the joint appendix is the right to look at financial records. On top of that, 40,000 pages of documents were produced during discovery. And the only exhibit that the order actually introduced at trial was a financial record, which is at page 1001 of the confidential appendix. So if the order had wanted to try to show some violation of the prioritization at the trial, they could have done it, but they can't retroactively say, oh, it was the foundation's burden to show compliance. It was the order's breach of contract claim. They didn't prove it, as Judge Friedrich found. Do you have anything on the other claims? Um, I guess just briefly on the adverse action, Mr. Herrick wanted to compare the situation of the violation of the 2016 agreement with the court's finding that the 2009 MOU was not any provision for termination, whereas the 2016 agreement expressly provided, it's singled out, not only is there a termination for breach provision, but on top of that, adverse action is specifically called out as a basis for termination. Again, the language is broad. And on top of that, Mr. Jason Johns, who was the order's witness, admitted that in addition to disenfranchisement, he said, quote, there's other adverse actions that can take place. That's at page 699 of the joint appendix. And Mr. Ruckman also testified at 387 that, in fact, this language was intended as a remedy for the perpetual attacks on the foundation of the tension between the organizations. As Judge Friedrich found... Can I ask, what interpretive significance do you think we should give to the fact that the phrase other adverse action appears right after the reference to disenfranchisement, which would suggest it's not just any old, small thing? Well, it says other adverse action, not similar adverse actions or existential threats, was Mr. Herrick's phrase. It uses broad language. And there's no evidence that the party... There's no evidence in the record that the parties meant something other than sort of natural meaning of those words that they chose. And the record demonstrated here that the order diverted funds, it engaged in competitive fundraising using holdings marks, willfully violated the trademark license agreement, publicly attacked the foundation, and it continued doing all of that even after the default notice was served. So none of that can compare to the issue with respect to the MOU, which was a press release, which was the order just kept right on going. Okay. Judge Rao, any questions? Judge Walker? Thank you, Your Honor. Does Mr. Herrick have any time? Mr. Herrick has 30 seconds left. We'll give you two minutes. Thank you, Judge. I don't think it's gonna take me that long. The appellee's argument that it had never been the practice of the parties that the failure to fund the approved budget of the order was a default on behalf of the foundation. Well, that was the prior practice. It's clear that the practice in 2019 did not restrict the grant issued saying if we can't afford to pay, we don't have to pay. And the reason for that, as was testified at the trial, is that the order would never have agreed to that provision. Okay, because it was clear even before the budget of $6.4 million was approved, that the foundation had raised the specter of substantially reducing what had been paid to the order for the prior fiscal years. And in viewing the financial circumstances, the foundation, which were swirling downward at an alarming rate, it would have been foolish for the order to enter into an agreement that allowed the escape hatch for the foundation that had negotiated in the prior agreements. Mr. Herrick, wouldn't it have been equally foolish for the foundation in 2019 to promise to pay the full $6.5 million over the course of 12 months? Well, it may have been foolish to do that, but that's exactly what they did with knowledge of their spiraling downward finances. They didn't even present to the order restricted language. It would have been a very simple matter for them to do that. They didn't. And the reason they didn't is because Mr. Ruckman testified at the trial, the order would never have agreed to it. And so it was never agreed to that it was going to be restricted. And given the circumstances, which the money had already been expanded by the order, and that was the prior practice, okay, you can't just reduce the payments by 95% and say, oh, too bad, so sad, you don't have a program anymore. I just don't see how that doesn't cut both ways. The foundation would have never guaranteed to and to your point, the order would have never agreed to something short of a guarantee. But they did, Judge, they didn't preserve the right as they had in the prior years to not fully fund the order's budget. And they could have done that. They didn't even ask for that restriction because they knew that the order would not agree to it. Dr. Walker, anything else? Judge Rapp? Thank you, counsel. Case is closed. Appreciate it.
judges: Katsas, Rao, Walker